Filed 10/21/20  In re S.F. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.F., a Person Coming Under the Juvenile Court Law. | B304748 |
| | (Los Angeles County Super. Ct. Nos. 19CCJP06118, 19CCJP06118A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| Y.F. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Victor G. Viramontes, Judge.  Affirmed.

Landon Villavaso, under appointment by the Court of Appeal, for Defendant and Appellant Y.F.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant S.F.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellant Y.F. (mother) was involved in a domestic violence incident witnessed by her seven-year-old son, S. The evidence suggested that mother hit her mother (grandmother) in the face and shoved her, causing grandmother to fall and hit her head. The incident prompted several 911 calls. Mother was arrested, grandmother was treated at the hospital, and S. was detained pursuant to Welfare and Institutions Code section 300.[1] S. was placed with his father (father) in Oregon pursuant to section 361.2. Four months after the initial incident, the court sustained jurisdiction over S. under section 300, subdivision (b)(1), and entered a disposition order granting father full physical custody with visitation for mother.

Mother and S. appealed, asserting that there was insufficient evidence based on the single incident—which mother claimed was an accident—to support the jurisdiction and disposition orders based on a risk to S. We affirm. Substantial evidence supports the court's finding of a risk to S. based on the domestic violence incident and mother's continued failure to acknowledge her role in the incident.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

# FACTUAL AND PROCEDURAL BACKGROUND

## A. Detention

S. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on September 17, 2019, after a caller reported that mother was arrested for elder abuse following an altercation with grandmother. After law enforcement arrived in response to a neighbor's call, grandmother was transported to the hospital and S. was taken into protective custody.

A children's social worker (CSW) interviewed the Los Angeles Police Department (LAPD) officer who responded to the call at the home where S. and mother lived with maternal grandparents. The officer stated that he and a partner responded to a call regarding an assault at the home; as they were driving to the home, 911 received two additional calls regarding the incident. When the officers arrived, they saw a crowd of people in the front yard and heard screams coming from inside the home. The officers found that a neighbor, Nancy, was restraining mother inside the home in an attempt to protect grandmother. Mother "was uncooperative and only stated that she was the victim and she did not want child [S.] released to the Maternal grandparents." Maternal grandfather (grandfather) was in the home, but said he did not observe anything, which officers found unlikely. When officers interviewed grandmother at the hospital, she was also uncooperative. Grandmother had a cut on the back of her head and bruising on her face.

Officers interviewed S., who said he observed mother and grandmother arguing in the doorway of the bedroom he shared with mother. According to the CSW's summary of the officers' statements, S. saw mother punch grandmother in the face, pull

3

grandmother's hair, and shove her.  The fight continued into the living room, which S. observed as he stood in the hallway.  S. saw mother and grandmother make their way into the kitchen, and S. heard pots and pans hit the floor.  Mother came out of the kitchen and took S. to the bedroom; a neighbor later came and took S. outside.

Neighbor Nancy told officers that she was "in the back house that she rents" when she heard grandmother calling her name for help.  Nancy entered the home and saw grandmother on the kitchen floor, bleeding from her head.  Grandmother asked Nancy to get S. from mother's bedroom "as she did not want [mother] to hurt him."  Nancy went to the bedroom, but the door was locked.  As Nancy returned to the kitchen to tend to grandmother, mother "exited the bedroom and came charging at her."  Nancy wrestled mother to the floor and pinned her down until law enforcement arrived.

When the CSW spoke directly with S. about the incident, he said he and mother were in their bedroom, and he began to cry because mother told him to be quiet.  Grandmother knocked on the door, and when mother opened the door, she and grandmother began to argue.  Mother shoved grandmother and punched her in the face.  Mother pulled grandmother's hair and continued to shove her.  The fight continued through the living room and into the kitchen; S. said he saw grandmother on the floor before mother took him back to the bedroom.  A neighbor arrived and took S. out of the home shortly before police arrived.

The CSW interviewed mother at the jail.  Mother said she had been in the backyard drinking beer with Nancy; she had consumed two to three regular-sized beers.  Mother came into the house, and grandmother "got into her face and began to argue

4

with her." When mother told grandmother to "get out of her face," Nancy came in and tackled her from behind. Mother said that Nancy was the aggressor, and showed the CSW a scratch on her chest, a bruise on her left forearm, and "bruising on her wrists which appear to be finger marks." Mother said that grandmother had a history of shoving and verbally abusing mother.

Mother said that because of the tension between her and grandmother, she and S. planned to move to Oregon and she and father planned to reconcile. S. had not met father in person, but "they do FaceTime each other on a regular basis." Mother said she had already purchased airline tickets so they could move in November. A background check showed that mother had been convicted of a misdemeanor for trespassing in 2014 and sentenced to one day in jail and 36 months' probation; she had no other criminal history.

The CSW interviewed grandmother, who "was only willing to say that mother . . . had been in the backyard drinking alone," and when mother came inside, she "bumped into [grandmother] while walking in the hallway." Grandmother said she "just remembers falling back and she is unsure if she hit her head against the door or a floor." Grandmother said she did not know why there was blood on the corner of the stove or the kitchen floor. The CSW asked grandmother "how she ended up with her entire left cheek bruised, the area under her right eye bruised, and purple baseball sized bruising just outside her right bicep, right tricep and left bicep. [Grandmother] just looked at the floor and shook her head." The detention report states, "CSW attempted many times to find out from [grandmother] why she was not being forthcoming and she only said that she felt

5

conflicted and was embarrassed to admit to a stranger that her own daughter had assaulted her." The CSW also interviewed grandfather, who said he did not see anything because he was in his bedroom at the time.

The CSW interviewed Nancy, who said that she entered the home after she heard grandmother yelling for help. Nancy found grandmother on the kitchen floor bleeding from the back of the head. Grandmother asked Nancy to get S. out of the bedroom, but Nancy found the bedroom door locked. Mother then came out of the bedroom and began walking toward grandmother as she said in Spanish, "You see what happens, I told you to leave me alone." Nancy said mother attempted to assault grandmother again, but Nancy intervened by stepping between them. As mother and Nancy scuffled in the hallway, they knocked open the door to the grandparents' bedroom. Mother then said to grandfather in Spanish, "Dad, she wants to kill me." Nancy was able to pin mother to the floor, and law enforcement arrived shortly thereafter. Nancy said S. observed the altercation, because he was in the hallway the entire time.

The detention report stated that DCFS found S. to be at moderate risk of future abuse or harm from domestic violence. DCFS did not place S. with grandmother, because she showed an unwillingness to assist DCFS in its investigation, and because mother was the caretaker for grandmother and grandfather. S. stated that he wanted to live with mother and maternal grandparents.

On September 19, 2019, DCFS filed a juvenile dependency petition with two allegations: count a-1 under section 300, subdivision (a), and count b-1 under section 300, subdivision (b)(1). Both counts stated that mother engaged in a violent

altercation with grandmother in the presence of S., including hitting grandmother in the face with a fist, pulling grandmother's hair, and pushing grandmother, causing her to fall. Both counts also stated that mother's violent conduct in S.'s presence endangered S.'s physical health and safety, and placed him at risk of serious physical harm.

Father, mother, and S. appeared at the detention hearing on Friday, September 20, 2019. S.'s counsel asked for a one-day continuance, noting that DCFS had not interviewed father and the detention report said nothing about father's wishes. Father's counsel objected, stating, "My client has indicated that he spoke with the social worker and made it abundantly clear that he would like for [S.] to be returned to him. He flew in from Oregon for that purpose." Father was planning to fly back to Oregon on Sunday, "so he is requesting release of [S.] to him today."

The court granted the continuance. The court made a preliminary finding that detaining S. from both parents was appropriate, and continued the hearing to the following Monday. The court ordered DCFS to interview father and file a last-minute information by Monday morning.

The last-minute information filed September 23, 2019, stated that father lived in Oregon with his two younger children, K., age four, and M., age three. Father shared custody of the two children with his ex-partner. Father attended college three days a week, and worked three days a week as a car mechanic. Father said his income was sufficient to support himself and all three children if S. were released to him. If S. were to live with father, he would attend the same elementary school as his siblings and his paternal aunt would provide child care while father was working. Father said that although he had not met S. in person

7

before the detention hearing, he and S. maintained a relationship by FaceTiming about twice a week. Father recognized that if S. were released to him, he and mother could not reconcile in November as planned; father agreed to this and said he would rather have S. with him than in foster care.

DCFS stated that it was concerned that father had not met S. in person until recently. Because of the expedited time frame, DCFS had not yet spoken with S. about his wishes regarding father. DCFS requested that the court continue the disposition hearing to allow time "to conduct a more detailed assessment."

**B.    Detention hearing**

At the hearing on September 23, 2019, DCFS requested that the court detain S. from both mother and father, stating that DCFS "has continuing concerns regarding placement with father," including "the fact that there seems to be a lack of a relationship between the father and the child." Mother's counsel asked that S. be released to mother, because she had moved out of the grandparents' home and had a safety plan that involved limiting contact with grandmother. Father's counsel and S.'s counsel asked that S. be released to father.

The court held that DCFS carried its burden regarding detaining S. from mother but not father. The court found father to be nonoffending, and ordered that S. be released to him. The court ordered monitored visitation for mother. The court stayed its order for seven days, and released S. to father on September 30, 2019.

**C.    Jurisdiction/disposition report**

The jurisdiction/disposition report filed November 8, 2019 stated that S. was living with father, and during a FaceTime interview with the DCFS investigator, S. was "content and

comfortable." S. told the investigator that he felt safe with father, but he missed mother very much. Father noted no behavioral concerns with S. Paternal aunt, who cared for S. while father worked, said that S. was well-behaved, quiet, and "a great kid." When asked about the domestic violence incident, S. began looking around the room, repeatedly said he could not remember what happened that day, and said he wanted to forget about the incident. DCFS was waiting for Oregon Child Protective Services to visit father and S. at their home.

In her interview with DCFS, mother reported that she had been working as a dental assistant for seven years. She said that she had lived with grandmother and grandfather, who were older and had medical needs, which had taken a toll on her. Mother had recently moved and was renting a room from friends. She said she and father met in Oregon, and they knew each other for a year before she moved back to California while she was pregnant. Father did not know mother was pregnant until after she moved. Father and S. had "minimal contact"; father was "missing in action, never paid child support." Father once visited Los Angeles with a girlfriend and wanted to meet S., but mother said she did not feel comfortable having father and his girlfriend visit at the time.

Regarding the domestic violence incident, mother said she had been drinking with Nancy, and had about three beers. Grandmother "got in my face. She started attacking me in the hallway, from there she went running into the kitchen and then she started hitting me. She was hitting me, I was trying to get her off me, she always does that. I did not push her, I was trying to leave the room to the kitchen [*sic*]." Mother also said that although she and grandmother had many verbal arguments, this

9

physical altercation was an isolated incident. Mother also said that after grandmother summoned Nancy, "Nancy was beating me up and told her son to call the cops." Mother said she did not know about grandmother's injuries, but grandmother "falls all the time." Mother's criminal case was pending.

Mother said she did not have a history of drug or alcohol abuse, but she had been attending Alcoholics Anonymous meetings, and she agreed to submit to drug and alcohol testing. Mother was enrolled in a parenting education program and individual counseling, and she agreed to enroll in an anger management program. She said she was willing to do whatever it took to reunify with S. Mother had FaceTime visits with S. daily; father monitored the visits and noted no concerns.

A social worker interviewed grandmother about the incident. Grandmother said that mother had been drinking, and as they passed each other in the narrow hallway, they bumped into each other. Grandmother said she fell and hit her head on a cupboard. Grandmother said she called Nancy because mother was drunk and she wanted Nancy to speak with her, not because mother was being violent. But Nancy called the police and paramedics and "made a big deal over something that wasn't." Grandmother also said that mother was a very good mother to S., but on the day of the incident she had been drinking, and "I just don't know what happened to her on that day. She has never behaved in this way." Grandfather said he did not see anything because he was in bed at the time of the incident.

The jurisdiction/disposition report stated, "The evidence suggests that the allegation [in the section 300 petition] is true." DCFS noted that S. told law enforcement and the CSW immediately after the incident that he saw mother punch

grandmother, shove her, and pull her hair. DCFS noted that it was concerned that S. missed mother, but also stated, "[I]t is concerning that mother and [grandmother] are not forthcoming about the incident." Grandmother "was very adamant that the incident never happened," and although mother admitted she made a mistake, DCFS was concerned that "mother and [grandmother] are downplaying and denying the situation." DCFS recommended that the petition be sustained and that reunification services be ordered for mother.

A last-minute information dated November 26, 2019 included an assessment of father, S., and their home from social workers in Oregon. The social workers found the home to be clean, well-stocked, and free of safety concerns. S. was in second grade and "presents as talkative and energetic." S. stated that he enjoyed living part-time with his siblings, and he liked Oregon but also missed Los Angeles. The social workers observed father as "affectionate and patient" with S. Father reported that S. continued to have daily phone or FaceTime conversations with mother. Father said that he planned to seek a family court order for full physical custody of S. with visitation for mother. Father was waiting for insurance coverage before he could enroll S. in individual counseling.

Mother said she had daily contact with S. by phone or FaceTime, and wanted to reunify with him. Mother had enrolled in individual counseling and a parenting program, had attended Alcoholics Anonymous meetings, and was willing to submit to drug and alcohol testing. DCFS noted that parents were willing to coparent but did not have a joint plan addressing the fact that they lived in different states. DCFS recommended that the petition be sustained with a family law order giving father sole

11

physical custody, joint legal custody, and visitation for mother at the discretion of father.

The LAPD report for the domestic violence incident was attached to the last-minute information. It stated that officers got a call regarding the incident at approximately 9:50 p.m. on September 16, 2019, and found the scene as described above. When officers interviewed Nancy, she reported that when she heard grandmother calling for help and found her on the floor, grandmother told Nancy to check on S. to make sure mother was not hurting him. When mother emerged from the bedroom and charged at grandmother again, mother "began punching at" Nancy, and "attempted to fight with [Nancy], hitting her in the face multiple times." Mother also grabbed Nancy by the hair. Nancy was able to subdue mother, and pinned her down until police arrived.

Officers talked to S., who "was very upset and appeared to be shaking and crying." He said he was in his room with mother, when mother yelled at him to shut up. Grandmother then entered the room and she and mother began fighting. Mother hit grandmother first. S. said he stayed in the bedroom while the fight happened, "and held his mouth shut to stay quiet."

Mother told officers that Nancy "chocked [*sic*] her out. [Mother] kept repeating that she chocked [*sic*] her out." Mother said she had been the backyard with Nancy and Nancy's son, and grandmother yelled at mother to come inside. Mother walked inside and "was then attacked by [Nancy] and [grandmother]. She was chocked [*sic*] and dragged into the bedroom where she was held down." The officers "observed no signs of strangulation" on mother, and "based on her inconsistent statements," they arrested mother for battery.

12

The officers attempted to interview grandmother at the hospital, but she was evasive. When asked what happened, grandmother said she fell. When asked if someone pushed her, grandmother got quiet and looked at the floor.

At the hearing on November 26, 2019, mother requested a continuance because S. was not present, and mother wanted to call S. as a witness. The court granted mother's request, and continued the hearing to January 29, 2020.

In a last-minute information dated January 29, 2020, father reported that mother had visited S. in Oregon, S. was happy to see mother, and there were no concerns regarding mother's visit. DCFS also submitted evidence that mother had four negative drug tests and two no-shows in November, December, and January.

## D. Jurisdiction and disposition hearings

At the jurisdiction and disposition hearing, held over three days in January and February 2020, the court admitted exhibits from both DCFS and mother. S.'s counsel called S. as a witness, and he testified about the night he saw mother and grandmother argue. S. said that when mother turned off the light in the bedroom, S. said, "I can't see. I can't see." Then "my mom turned back the light on [*sic*] and my grandma barged in the room." S. said he "just walked by them arguing and crying at the same time, and I went outside and the kid neighbors were out there saying. 'What happened?'" S. said that mother and grandmother argued "with words," and it was the first time he had ever seen them argue like that. S. also testified, "I saw my mom push my grandma in the kitchen and my grandma fell into the kitchen and stuff fell on her." S. denied that mother punched grandmother or pulled grandmother's hair. S. also said that he told the truth to

the police officers he spoke with that evening. S. testified that he lived with father and felt safe there. S. testified that he also wanted to live with mother, and "I feel safe with mom now," "because the argument's done" and mother is "going to be a better mom."

Mother called grandmother to testify. Grandmother stated that she and mother argued because "I didn't like that she was drinking." Grandmother said mother was angry and pacing, and "she was coming out of the kitchen and I was coming in and we tripped over each other," and "[t]hat's why I fell." Grandmother said that when she fell she knocked over some kitchenware and hit the back of her head. She said she did not have any other injuries, and when asked about the additional bruising noted in the detention report, grandmother said she did not remember that. Grandmother said S. was watching television in the living room at the time. When asked if mother punched her, grandmother said, "Well, I was mad. I didn't feel anything," and, "I don't remember." When asked if mother pulled her hair, grandmother said, "I don't remember. No." Grandmother also testified, "It was a terrible accident. It was an accident because my daughter, she didn't know what she was doing."

Grandmother said she called Nancy in because she had fallen, and "I called her so she could talk to [mother] and hug her or something because my daughter was drunk, but what Nancy did first was call the police." Then Nancy was holding mother down and "back then I didn't know why she was holding her like that." On cross-examination, grandmother testified that she and mother had never experienced an incident similar to the one that evening. When asked about the CSW's comment in the detention report that grandmother was embarrassed to tell a stranger that

14

her daughter had assaulted her, grandmother said she did not remember if she said that.

The parties then argued their positions regarding adjudication. S.'s counsel requested that the petition be dismissed because DCFS had not met its burden based on this single incident. S.'s counsel also argued that there was no evidence of a current risk to S., and referenced mother's evidence that she had been attending Alcoholics Anonymous meetings and counseling. Mother's counsel also asked that the petition be dismissed. Mother's counsel asserted that even if mother pushed grandmother, S. was never at risk of serious physical harm, and there was no evidence of ongoing harm. Counsel for DCFS asked the court to sustain the petition. Counsel for DCFS asserted that mother "is not willing to admit her role and participation in that domestic violence incident and she's claiming that other people are the aggressors," so there was "a current risk because there are still issues that are not addressed."

The court found that DCFS carried its burden as to count b-1, but not count a-1. The court found that S.'s statements immediately following the incident were credible and consistent with the physical evidence. The court also stated that mother's statements that other people were the aggressors and grandmother's accounts of a less violent confrontation were not credible. The court further found that mother's alcohol use and mother's and grandmother's "attempts to minimize the circumstances creates an ongoing risk that presents a basis for jurisdiction." The court therefore found S. to be a person described in section 300, subdivision (b)(1), and dismissed count a-1 from the petition.

The court then turned to disposition. Mother testified, and stated that before this case began, father "didn't know [S.] in person. He just pretty much went missing and he didn't – we didn't hear from him for seven years." Mother said the first time father met S. was in court during this case. She testified that she moved out of grandmother's home immediately after the incident in September 2019, and she currently lived with her boyfriend of four years and his mother. Mother testified that she had participated in four or five sessions of individual therapy, which addressed dealing with emotions and anger management. On cross-examination, however, mother admitted that she had never discussed the domestic violence incident with either of her two therapists. Mother had attended about 40 Alcoholics Anonymous meetings, but she did not have a sponsor. She said she had visited S. in early December, and she called S. every day. She stated that her visits were monitored. When asked who was the aggressor in the domestic violence incident, mother said her attorney advised her not to answer.

Counsel for DCFS requested that the case be terminated with an order under section 361.2[2] providing joint legal custody, sole physical custody to father, and monitored visitation for mother. DCFS argued that although the case was based on

---

[2]Section 361.2 states that when a child is removed from a parent under section 361, and the child's noncustodial parent "desires to assume custody of the child," then "the court shall place the child with the [noncustodial] parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) The court may then "[o]rder that the parent become legal and physical custodian of the child" and "terminate its jurisdiction over the child." (*Id*., subd. (b)(1).)

domestic violence, mother had done nothing to address that issue and "liberalization would be premature" until the domestic violence issue was "discussed and addressed." Counsel for DCFS noted that mother had failed to take responsibility for her actions in the domestic violence incident, and therefore S. could be at risk of harm if returned to mother. Counsel for father joined DCFS's request that the case be closed with joint legal custody and physical custody to father.

S.'s counsel noted that S. said he wanted to live with both parents, and he enjoyed spending time with his half-siblings. S.'s counsel argued that DCFS had not met its burden to show by clear and convincing evidence that removal was necessary, because there was only a single incident and no evidence of a current risk. Mother's counsel requested a home-of-parent order releasing S. to mother based on "the significant progress and programs that mother has made since detention." Mother's counsel noted mother's participation in Alcoholics Anonymous and counseling, mother's negative drug tests, and the bond between mother and S. She also asked that if S. were not released to mother, the case be closed with an order for unmonitored visitation.

The court held that DCFS carried its burden to show a risk of harm supporting removal of S. The court found by clear and convincing evidence that there would be a substantial danger to S.'s physical health, safety, or well-being if he were returned to mother's care. The court noted that mother "has not taken responsibility" or "made progress towards addressing" the issues in the petition. When asked for additional clarification about the basis for its ruling, the court stated that mother and grandmother's versions of the facts were not credible, and

17

mother's failure to "take responsibility for the domestic violence in the home presents the court with questions about the mother's ability to be sufficiently protective going forward from these kinds of incidents and to be able to control herself from these kinds of incidents. And I'm finding that's a current risk today that supports removal." The court ordered unmonitored visitation for mother, including unmonitored phone and video visits. The court terminated the case under section 361.2, and ordered joint legal custody, sole physical custody to father, and unmonitored visitation for mother. Mother and S. each timely appealed.

## DISCUSSION

Mother contends the juvenile court erred in two ways: first, by finding that S. was a person described by section 300, subdivision (b)(1), and second, finding that removing S. from mother was warranted under section 361. S. filed a joinder to mother's brief that presents no separate arguments. "'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

## A. Jurisdiction

Mother contends that the court erred in exercising jurisdiction over S. because on the date of the jurisdiction hearing, there was no current risk of harm to S. She argues that the altercation was an isolated incident, and mother had moved

18

out of grandparents' home, which "alleviated the risk of ongoing conflict between" mother and grandmother. We find that the court's jurisdiction finding was supported by substantial evidence.

A child may be adjudged a dependent of the court under section 300, subdivision (b)(1) if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." "Exposure to domestic violence may serve as the basis of a jurisdictional finding under section 300, subdivision (b)." (*In re R.C.* (2012) 210 Cal.App.4th 930, 941.) "[S]ection 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.)

Here, the domestic violence was serious. While S. watched, mother was involved in an incident that prompted multiple calls to 911, and resulted in grandmother being transported to the hospital by ambulance and mother's arrest. Grandmother sustained a bleeding wound to the back of her head, as well as bruising on her left cheek, under her right eye, and on both arms. When police spoke with S. at the scene, he was shaking and crying. S. told police that mother hit grandmother first, and that mother pushed grandmother. When the CSW interviewed S., he said that mother shoved grandmother, punched her in the face, and pulled her hair, and that the fight proceeded from the bedroom, down the hallway, and into the kitchen.

The circumstances also suggest that S. himself may have been at risk. S. told police that the fight started after mother yelled at him to shut up, prompting grandmother to come to their

19

bedroom. In addition, Nancy said that when she came into the house, grandmother asked her to check on S., who was in the bedroom with mother, because grandmother was afraid that mother might hurt S.

Importantly, mother never took any responsibility for what occurred in the initial incident. The night of the domestic violence incident, mother told the police that Nancy tried to choke her. However, the police saw no evidence of choking and instead found that the evidence supported arresting mother. Mother then told the CSW that Nancy attacked her from behind. In the November 2019 jurisdiction/disposition report, however, mother said that grandmother "started attacking me in the hallway" and "started hitting me," and added, "she always does that." But at the jurisdiction hearing, mother called grandmother—whom multiple sources found to be less than forthcoming—to testify that mother and grandmother only bumped into each other in the hallway, and the whole incident amounted to nothing more than a misunderstanding.

Despite DCFS involvement and S.'s detention in September 2019, mother did very little before the jurisdiction hearing in January 2020 to address the problems leading to detention. She went to four or five individual counseling sessions, but she never discussed the domestic violence incident with either of the two counselors she saw. She began attending Alcoholic Anonymous meetings but she did not have a sponsor, and she did not enroll in a formal substance abuse program. In addition, mother was not forthcoming with DCFS about other aspects of the case. For example, she told the CSW in September 2019 that she and father planned to reconcile, she and S. had plane tickets to move to Oregon, and S. and father had a relationship in which they

FaceTimed with each other regularly. But in the jurisdiction/disposition report, mother stated that father was "missing in action" and she "never heard from him."

Mother compares this case to *In re Daisy H.* (2011) 192 Cal.App.4th 713, in which the court stated that domestic violence may support a finding of jurisdiction under section 300, subdivision (b)(1), "but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*Id.* at p. 717.) The comparison is not apt. In *Daisy H.*, the court found insufficient evidence that domestic violence placed the children at risk because "[t]he physical violence between the parents happened at least two, and probably seven, years before the DCFS filed the petition. There was no evidence that any of the children were physically exposed to the past violence between their parents and no evidence of any ongoing violence between the parents who are now separated." (*Ibid.*) Here, the incident was not a long-past occurrence that did not affect S.; to the contrary, the physical violence occurred in S.'s presence and was the reason the case was opened.

Mother also compares this case to *In re J.N.* (2010) 181 Cal.App.4th 1010, in which the court considered "whether evidence of a single episode of parental conduct was sufficient to bring the . . . children within the juvenile court's jurisdiction." (*Id.* at p. 1022.) There, the three children and the parents were in a car accident while father was driving. Father and mother were both intoxicated, at least one of the children was not in a restraint, and two of the children were injured. There was no evidence of other instances in which the parents endangered the children. Mother told social workers that she "regretted drinking

21

over her limit and not stopping father from driving under the influence with the children in the car and gave reassurances that it would not happen again and her children's safety would come first." (*Id*. at p. 1019.) The court noted, "While past harmful conduct is relevant to the current risk of future physical harm to a child [citations], the evidence as a whole must be considered." (*Id*. at p. 1025.) The court acknowledged that "by the time of the jurisdiction/disposition hearing, the criminal court had ordered mother to complete substance abuse and parenting programs and placed her under probation supervision. Significantly, both parents were remorseful, loving, and indicated that they were willing to learn from their mistakes. Although father was still incarcerated at the time of the hearing, mother was available to provide care." (*Id*. at p. 1026.) The court therefore found there was insufficient evidence to support a finding of jurisdiction under section 300, subdivision (b). (*Id*. at p. 1027.)

The court in *In re J.N.* stated, "In evaluating risk based upon a single episode of endangering conduct, a juvenile court should consider the nature of the conduct and all surrounding circumstances. It should also consider the present circumstances, which might include, among other things, evidence of the parent's current understanding of and attitude toward the past conduct that endangered a child, or participation in educational programs, or other steps taken, by the parent to address the problematic conduct in the interim, and probationary support and supervision already being provided through the criminal courts that would help a parent avoid a recurrence of such an incident. The nature and circumstances of a single incident of harmful or potentially harmful conduct may be sufficient, in a particular case, to establish current risk depending upon present

circumstances." (*In re J.N., supra*, 181 Cal.App.4th at pp. 1025-1026.)

Here, mother expressed no understanding about her involvement in the serious domestic violence incident that occurred in S.'s presence. She did not seek to address the situation with educational programs. To the contrary, mother provided several different stories about what happened, and by presenting grandmother's testimony to the court, minimized the incident and tried to pass it off as nothing more than an accident. Mother did not take responsibility for the incident, nor did she address the issue in counseling. Thus, this case presents a different situation than that in *In re J.N.*, where the mother acknowledged the parents' role in endangering the children, enrolled in a substance abuse program, and resolved to ensure a similar situation would not happen again. The evidence here was sufficient to support the court's jurisdiction finding.

## B. Disposition

Mother also contends that there was insufficient evidence to support removal of S. under section 361, subdivision (c). Under section 361 , subdivision (c)(1), a juvenile court may remove a dependent child from a parent's custody when it finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." "[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed

23

as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

Mother notes that the juvenile court found that mother's version of facts was not accurate, and stated "that failure to, one, present the facts, and two, take responsibility for the domestic violence in the home presents the court with questions about the mother's ability to be sufficiently protective going forward from these kinds of incidents and to be able to control herself from these kinds of incidents. And I'm finding that's a current risk today that supports removal." Mother asserts that this finding "was based on speculation and was contrary to the credible evidence," because mother "admitted to making a mistake and wanted to comply with all the juvenile court orders to reunify with her son." Mother also argues that it is "reasonable to assume the mother could not admit to being the aggressor in the altercation" because she had a criminal case pending.

The court's conclusions were not based on speculation or contrary to the evidence. Mother refused to take any responsibility for the domestic violence incident. At the jurisdiction hearing, she called grandmother as a witness to say that mother and grandmother only bumped into each other in the hallway. This contradicted S.'s testimony that he saw mother push grandmother down and hit grandmother, and all prior accounts of the incident, including those from mother herself. The juvenile court was entitled to find the other accounts more credible, and we defer to the juvenile court on issues of credibility. (See *In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)

24

Moreover, the situation did not place mother in a "confession dilemma," as mother asserts. This issue was discussed in *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*), in which a father, Rogelio, was accused of sexually abusing his young daughter. However, that issue had never been adjudicated by the court, and the court failed to consider evidence such as the fact that a "psychologist exonerated Rogelio of any child molestation, or any tendency toward child molestation." (*Id*. at pp. 1741-1742.) Nevertheless, "the very fact that Blanca [the mother] and Rogelio have continually denied that Rogelio is a child molester [was] asserted by the social services agency as evidence supporting the detriment finding." (*Id*. at p. 1752.) Referring to this as a "confession dilemma," the appellate court observed, "[I]t is an outrageous injustice to use the fact parents deny they have committed a horrible act as proof that they did it. That really is Kafkaesque." (*Id*. at pp. 1752-1753.)

The reasoning of *Blanca P.* does not apply here, where the jurisdictional findings had already been adjudicated. Moreover, mother's pending criminal case did not prevent her from being forthcoming with the juvenile court. "Testimony by a parent, guardian, or other person who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding." (§ 355.1, subd. (f).) Thus, a parent may testify in a juvenile court dependency proceeding, and her "privilege against self-incrimination would be statutorily protected. The testimony could not be utilized in criminal proceedings." (*In re Jessica B.* (1989) 207 Cal.App.3d 504, 517-518; see also *In re Mark A.* (2007) 156 Cal.App.4th 1124, 1142 ["California law offers a promise to a

25

parent that his or her testimony in juvenile dependency proceedings, as well as his or her statements made in therapy in furtherance of the reunification process, will not be used against the parent in a subsequent criminal prosecution"].) In addition, cases have held that the confession dilemma does not apply when a parent is unwilling to even acknowledge the issues that led to detention. (See, e.g., *In re Madison S.* (2017) 15 Cal.App.5th 308, 327.)

Mother further asserts that there were alternatives to removal, such as ordering mother to cease contact with grandmother, unannounced home visits, and family counseling. Indeed, "less drastic alternatives to removal may be available in a given case including returning a minor to parental custody under stringent conditions of supervision by the agency such as unannounced visits." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 148.) However, mother was not forthcoming with DCFS or the court about important aspects of her and S.'s lives. For example, mother told the CSW in September 2019 that she and father planned to reconcile and she had plane tickets in preparation for her and S. to move to Oregon. But at the disposition hearing in February 2020, mother testified that she had been with a different a boyfriend for four years. Mother told the CSW in September 2019 that S. and father had a strong relationship in which they visited via FaceTime on a regular basis. But in the jurisdiction/disposition report, mother said that father and S. had "minimal contact," and father had been "missing in action." She then testified at the disposition hearing that father "pretty much went missing" and "we didn't hear from him for seven years." And as discussed above, mother never acknowledged domestic violence or its potential effect on S.

26

Nothing in the record suggests that following the disposition hearing, mother would be willing to work with DCFS after months of being misleading or dishonest about the case. Thus, the evidence does not support mother's contention that alternatives to removal were warranted here.

Mother also asserts that the juvenile court failed to consider the bond between S. and mother and mother's family, noting that S. lived with mother his whole life. Mother asserts that twice-monthly visitation "was not enough to maintain the parent-child relationship and it was ultimately not in the minor's best interest." Mother cites no authorities for these contentions. As DCFS correctly points out, "familial considerations do not form a part of the court's analysis under section 361, subdivision (c), which focuses on whether a dependent child would be physically safe if returned to the custodial parent's home."

In short, although mother alleviated some tension by moving out of grandmother's home, she never acknowledged her role in the domestic violence that took place in S.'s presence, and she was not forthcoming about important issues with DCFS or the court. Thus, there was substantial evidence to allow the court to find by clear and convincing evidence a substantial danger to S.'s health or well-being, and that there was no reasonable means to protect S. without removing him from mother's custody.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.